May it please the Court. My name is Jason Wilson. I'm appearing on behalf of the appellants, Open Artificial Intelligence, Inc. and Guy Ravine. I'm going to focus my argument today on two points. One, that this was an inappropriate mandatory injunction. And secondly, that there was an unreasonable delay in seeking the injunction, which undercuts any case for irreparable harm. I had a preliminary question for you. I know before the district court there was a change of counsel in this case, and one of the arguments made was essentially we needed an opportunity to supplement some things, maybe update the record a little bit, and that was not allowed. Is there anything in the record, and please don't get into attorney-client communications, is there anything actually in the record that says Why Bird Morella is no longer counsel in this case? There is not, Your Honor. Okay. Fair enough. You may proceed with your argument. I just wanted to check that box. Okay. Starting off first with why is this a mandatory injunction. So let's talk about the status quo before they file the lawsuit. And by the way, actually it would be very useful if we used the lens of thinking of this as a reverse confusion case in which the senior user, which I would contend is my client, Open Artificial Intelligence, is getting swamped out in advertisement in the marketing ventures of the junior user, Open AI, Inc. And that's an important lens to have, and a touchstone case for that is a Marquis case, which Judge Owens was on years ago. So in this case, the senior user, Open Artificial Intelligence, had a website, was using its website in connection with his interest in artificial intelligence, eventually progressed to using that website to have an image generator. When was that image generator first on that website? On my client's website? That's correct. I believe it was November 16th, 2020. But the district court said that all that was on November 16th was a landing page with, in the meantime, play with some stable diffusion, which was a third-party product. When did you actually have a product of yours that was an image generator on there? The image generator itself wasn't there until November 16th, 2022. There were other activities on the website that were outlined in the Rule 59 motion. I mean, the district court says specifically in the opinion, it says, Defendant Ravine represents that he created and publicly launched his own text-to-image generator on November 16th, 2022. As shown below, however, Open AI was only hosting the third-party stable diffusion in November of 2022 and then has the picture that says, in the meantime, play with some stable diffusion. And stable diffusion is not the image generator from your company, right? I understand. I understand your point, Your Honor. Yes, I understand your point. The hosting started, my understanding is that the hosting started November 16th, 2022. But my point is, my point is that when are you using the mark in connection with your goods and services? He was using the mark in connection with his goods and services as far back as 2015. No, but in terms of an image generator. And in terms of an image generator. Does it change from being stable diffusion to a different, your own image generator at some point? And if so, when is that? I don't know the answer to that question, Your Honor. I would contend, though, it doesn't matter because he was using his mark earlier in other ways in providing services. Well, we have to review the district court's factual findings under deferential standards. And the district court didn't seem to think that the earlier uses were uses in commerce that triggered anything. And so this issue of what happens with an image generator then becomes important. And your brief puts a lot of weight on this November 16th. So that's why I'm focusing on November 16th because the district court seemed to make a factual finding that you were using it. The mark is on the Web page, but not in connection with your goods and services because it's a third party thing that you just linked to. And my question to you is, do you contend that that counts or did the image generator change at some later point? And if so, what is that? So I contend that that counts, Your Honor. We contend that that counts. But the more important point is the registration of our mark originally in 2017 when we obtained the mark was for Class 42 services. And even though it wasn't for providing the same types of goods that the appellee was providing, the United States Trademark and Patent Office on four separate occasions decided not to give them trademark rights. The salient fact here for the purposes of viewing this as a mandatory injunction was the status quo was at the time that the lawsuit was filed was we were recognized by the United States Trademark and Patent Office as the senior user with some rights. As a result of the fact that we were the senior user with rights, the U.S. Trademark and Patent Office first alerted them in 2017 that our application was out there. Later on alerted them in early 2023 that their mark had not required distinctiveness, hadn't required secondary meaning, so wasn't superior to our mark. And then later on in two further determinations in 2023 in February, which is at ER 906, excuse me, the specific issues raised in ER 908, and then in April in the specific decision is in ER 955, said there's a likelihood of confusion. And so let me explain why it's so important to view this as a reverse confusion case. In a reverse confusion case, there is confusion, but the confusion is caused by the junior holder trying to swap by advertising the rights of the senior holder. And the Trademark Office recognized the possibility of confusion, refused to give them the rights that they wanted, which is superior trademark rights. So what they did here is they went to the district court and got the district court in an expedited procedure of a preliminary injunction to decide that they had superior trademark rights. There was no decision before the district court's preliminary injunction order that they were the senior holder. The decision of the USPTO, which I recognize can be disregarded by a trial of fact in a trademark trial, was that we were the senior holder. I find the use of a preliminary injunction to flip who the senior holder is to be extraordinary and unprecedented. I would also note that the reason why this is a mandatory injunction that needs to be viewed through a less, a more stringent lens, is what we have here is a takedown order that we have to take down our domain name, open.ai, which he registered on March 15, 2015, eight months before this company ever existed. So let me ask you this. To the extent that you are arguing mandatory injunction, this is a mandatory injunction that met a higher standard, what remedy are you seeking just to allow the domain name to be used? No, I think it should entirely be reversed and reversed. You're saying that you can't limit the scope of the injunction to conform to the standard? Well, there are two different issues there. First of all, I think it is a mandatory injunction. It should be reversed because the law and facts here do not clearly favor them. The fact that the USPTO reached a different adjudication as to who the senior holder is should, at a minimum, prevent them from getting a mandatory injunction. With respect to why I think it should be fully reversed and vacated, and not for another hearing under a higher mandatory injunction standard, is that there's been unreasonable delay here. Let's be clear. But I don't think you quite answered my question. Are you just saying you want the mandatory? You're seeking a complete reversal? Because the other alternative is to say, well, it's a mandatory injunction if we think it is. And so district court, reconsider it and make it a prohibitory injunction. That's a remedy that this Court could decide to do. Well, I'm asking what you want. And I think your answer is you just want a flat-out victory. Well, in two parts, Your Honor. First of all, I would want it reversed and remanded because it's an inappropriate mandatory injunction. So that's number one. So a remand, there could be a redetermination, right? The reason why I do not think there should be a redetermination and it should, even for a prohibitory injunction, is because the delay in this case is too long and undercuts a finding of a matter of law of irreparable harm. So why do I say that? The focus of the injunction, what's in the order, what the appellee wanted, they wanted the website shut down. Okay? That's what they got in the order. That's the goal of their order. Not the website limited, that he couldn't put up an image generator, which is the reason why they claim they brought their complaint. They want it shut off. And that's what happened. If you go to the website now, there's nothing there. If that's the goal, to shut down the website, they knew about the website in 2015. It's in the record. There was a discussion in 2015 where a principal of the appellee asked to buy the web domain name and asked us to rebrand. We didn't do that. About a year and a half before they bought, they brought this lawsuit on February 19, 2022, and it's, I believe, at ER 953. Sam Altman, the famous guy you see on TV, goes to Guy Ravine and says, I'd like to buy your domain name and the related IP rights. Isn't that interesting? Sam Altman says, I want the domain name and the related IP rights. To me, that's an admission and concession that we had IP rights. Or it's to avoid paying all these lawyers. I mean, it could be that too, right? But be that as it may, Your Honor, what's the most salient point for irreparable harm? This court decided in Bonk or observed in Bonk in Garcia v. Google that even a delay of a few months, and I think in Garcia it was three or four months, can be too long. From the time that Sam Altman made his offer to purchase the domain name and the related IP rights to the filing of this lawsuit is 18 months. Let me ask you this real quick, just in terms of what's next in this case. So, obviously, I know what you want us to do in this case. Yes. But there is presumably a trial in this case, correct? Yes, there is, Your Honor. Is there a trial date in this case? Yes, October 13, 2025. Okay. So the question for us today is merely what happens between now and then? Because this is all going to be relitigated at that trial. That's true. But right now, because the website is taken down, he can't operate his business for any purpose. It's detrimental. I mean, obviously, at some point he could obtain money damages for that. But I still think it should be reversed and remanded. And finally, in my last 45 seconds here, if the Court was to conclude to that reverse, because of the damage that's being done, we would ask that any mandate be issued upon publication of the opinion.  We'll give you two minutes for rebuttal. Okay. Thank you very much. Good morning, Your Honors. May it please the Court, Margaret Caruso for Appellee Plaintiff, OpenAI, Inc. I'd like to start by addressing some of the questions Your Honors just had and clarifying the record on those points. To begin with the question of the defendant's image generator, they have never had an image generator that they developed. It has always, since November 2022, been that stable diffusion image generator. So, I mean, your own expert had a timeline of how it changed. Right. And that one shows that on December, so on November 26, 2022, it has the one that the district court referenced in the part that I quoted.  But then it has, on December 5th, it looks very different, and it's an image generator and it doesn't say anything about stable diffusion. What does the record say about what that was? Right. What the record shows is if you look at the terms of confusion, the terms of service that they had at the time, it reflected that they were still using the stable diffusion image generator. And subsequent discovery shows they never developed their own. They always used the stable diffusion one. We don't really have a finding from the district court on that. I mean, part of the problem that I have is that you read the briefs and everyone seems to agree on what the relevant legal standard is, and it's the standard from the converse case, which is whether or not you've established that the mark had acquired secondary meaning before the first infringing use by the alleged infringer. Everyone seems to agree that's the standard. The problem is it's just completely absent from the district court's decision, and the district court's findings don't really line up with that standard as reflected in this conversation we had about these details. So my question is why doesn't this just have to go back because she just missed what the correct standard was and didn't make findings that tailored to that? Well, I think that the record and her opinion both support there being secondary meaning at the very latest before November 2022 when the stable diffusion image generator... ...comes out at the very end of November, and then when she makes the actual finding, the clearest statement of secondary meaning, it bleeds into early 2023 in the operative sentence. So it just... In some sentences it does, in others it does not. There's a few things I could say about the CHAT GPT point, which, of course, is still before the defendants claim to have had any users at all. But she doesn't — there's no findings on that specific point. It really — you know, we emphasized in converse, we said, because the relevant date is so important to the secondary meaning analysis, we find that a specific determination of secondary meaning as of the relevant date must be made. And that doesn't seem to be present in this opinion. Well, she also says that there was secondary meaning by September 2022, and that is amply supported in the record as well. September 2022 is when OpenAI made available its DALI image generator product without a wait list. Now, that wasn't the first day it was available. As of September 2022, there were 1.5 million users already using it who had been onboarded in the summer. And we have in the record — So it instantly acquired secondary meaning? No, no, no, not instantly. It had been introduced. So if you look at — it wasn't first, so I can understand why it's confusing, because the defendants repeatedly characterize it as being introduced in September 2022. In fact, if you look at the announcement that was made in September 2022, and this is in the diet declaration, you can see that it references — this is Volume 6, ER 1219 to 1220. You can see that it references that OpenAI previewed the product in April to 200 artists, researchers, and trusted users. Then beginning in May, OpenAI onboarded 1,000 users per week. And then in July — and there's a separate page, Exhibit F to the diet declaration on page 1236 announcing the beta launch. And through that, over a million users requested access of OpenAI and gained access to it. And as a result, not only do you have these — by September 2022, more than 1.5 million users, you have a lot of press about this. So you have the New York Times referring to OpenAI's spring 2022 unveiling of DALI as the first product to, quote, capture the public attention regarding generative AI technology. In another article — and that's on Volume 7, ER 1370. In another New York Times article, it referred to that DALI product in the summer of 2022 as having been a hit with consumers. The Washington Post — this is page 1389 in the record — refers to DALI as having gone viral. Fortune magazine referred to it as a hype generator for OpenAI. Page 1402. Bloomberg referred to OpenAI's clever marketing and success. And in March 2023, called OpenAI out as having been on a promotional tear for the last two years, citing glowing media coverage for earlier projects like its GPT-3 API product — not ChatGPT, but GPT-3 — and DALI. And, of course, Time magazine had named OpenAI one of the most influential companies in 2022. This kind of evidence is the kind of evidence that dilution plaintiffs — who are claiming nationwide fame among the general consuming public — would be happy to have. But that's not the standard for secondary meaning. The secondary meaning standard is just that the primary significance of the term — I keep coming back to this, the timing question, which is, you know, after the pretty significant factual mistake with the date was caught and corrected, the district court then blue pencils the key holding at the end of the section and says that at least, you know, it was a bona fide user of the disputed mark since at least September of 2022, if not earlier, and that its mark by that point, and then it changed it to, had acquired secondary meaning. But then that's at the tail end of a two-page section where most of the evidence discussed is post-September 2022, and that's just kind of startling. It's like you make a finding of September 22, and most of the evidence is post. Something seems wrong here. I mean, it may be that you get remanded, and it's the same thing because the right findings will be made, and I hear what you're saying that, you know, they don't have an actual use, and so under the right test, it's all going to line up. But I mean, maybe we should even leave this in place while it's remanded. But I'm wondering just it seems like this opinion just is so flawed in terms of the wrong legal standard and then the facts. I don't know how it's salvageable. Well, Your Honor, it does ultimately decide that there was secondary meaning by September 2022, and that was not clear error. And just the cites that I've just read out, as I said — Right, but those articles in 2023 are looking back and saying back in at that time in 2022, in the spring of 2022, in the summer of 2022, this was viral. This was a hit. This was a hype vehicle for open AI. So much like a history book is about things that happened earlier, those articles are referring to the perception that existed in early 2022 with about open AI. So that's just incredibly powerful evidence of secondary meaning that exists here. As to the date change which resulted from the defendants raising the issue of the PTO's decision, I do want to also address that because the impression that one might have from defendants' arguments is that the PTO considered this secondary meaning evidence that I've just described or any secondary meaning evidence that open AI submitted to it and found it insufficient. That never happened. That is not in the record. What happened is that the PTO, upon the applications being made, found that the mark was not inherently distinctive. It was descriptive. Therefore, it could only be registered with a showing of acquired distinctiveness. The next step that happened was open AI said, well, we've been using this mark exclusively for five years. There is a presumption, then, that we've acquired secondary meaning. Please register our mark. The PTO said, no, that presumption alone isn't going to get you there. Try again. Then while that decision was pending, the defendant, Mr. Ravine, submitted a letter of protest and said, hey, I have this supplemental registration out there. You should deny their mark based on the supplemental registration. The PTO examiner said, ah, look, there is this here, too. So open AI, when you respond, make sure you respond to that as well. And that's what the record shows. And then those proceedings essentially ended, even though, well, open AI did submit secondary meaning evidence. But before the PTO could consider that, those proceedings were suspended because of this lawsuit. So just so that the record is clear, the PTO did not consider this secondary meaning evidence and find it deficient. And, of course, even if they had, it's a nonfinal decision at this point, and the nonfinal decisions, there's a reason they're nonfinal, because many marks only become registered further down the application process. If I understand what the district court did when it fixed that, the date error, was because the original order seemed to suggest that she was relying on the PTO's determination, which she believed was in January of 2022, and then the things changed after that. But then when she realized the date was actually 2023, she said, well, that's a determination about a January 2022 application, and therefore things changed after that. Is that fair to say that the January 2023 determination is based only on a snapshot of things as of a year earlier? Yes. So there was no evidence before the PTO or submissions about things between January of 22 and when it issued that decision in 23? There was no evidence that the PTO had considered before issuing a nonfinal refusal based on, as I said, the presumption and the confusion issue. Before you sit down, would you address the scope of the injunction? I realize you argue that they didn't raise it below. But the injunction goes beyond, or preliminary injunction goes beyond preserving the status quo and actually affirmatively directs them to take down their website. So that's very common in trademark injunctions, and they're generally deemed prohibitory when they do that. That's what the defendants have to do. They have to stop the infringement by stopping what's causing the confusion. And what was happening before November 2022, when they put up the stable diffusion image generator, was the defendant's website was directing to the plaintiff's website. And so to reinstate the status quo, they would redirect to our website. We would be fine with that, too, but we suspect they would not. In terms of, you know, is there some theoretical thing, if they wanted to, you know, start selling mushrooms on their website, could they maybe do that without causing confusion? Possibly. But they haven't said that they need to do that. If they needed to do that, they could petition the court to modify it. But the injunction goes beyond a prohibition on using the mark in connection with the sale or, you know, goods and services. Should it be narrowed to just that? It's unclear what they could do at this point, having already created this sort of magnet for confusion that wouldn't be confusing through that website. And Mr. Ravine has other websites. If he wanted to put the other website and then, you know, put whatever else he wanted on it, why was that justified by, you know, the showing here? Well, because he hasn't identified what he would put on it that wouldn't be confusing. If he wants to identify something that wouldn't be confusing, he could petition the court to modify the injunction to accommodate that. That was my question. Is there anything that would prevent, if this case were to go back to the district court, not talking about a remand, just this case is still in the district court, it's going to be in the district court until trial. Right. Is there anything preventing the other side from petitioning the court to say, hey, we've got a great idea, we're going to do open AI happy meals, and this is a great idea, can we do that? There's nothing that prevents them from going to the district court and asking for it to be modified there, correct? Absolutely. Thank you, Your Honors. I see I'm out of time. We ask that you affirm the court's decision below. It's amply supported by the record and not clear error. Thank you, counsel. Very quickly, Your Honor. There was use of the website, not an image generator, but other uses. He was promoting a discussion of artificial intelligence. The reason for the redirection is that unsecured traffic got redirected, but secured users who had registered with the website, they were exposed to a discussion of artificial intelligence issues. Is that in the record? I believe it's in the Rule 59 motion, but I don't know off the top of my head. In the Rule 59 motion, there's a fulsome discussion of what he was using the website for. There were users, there were interactions. It was, I think, consistently in the hundreds. By the time that he sought his registration, I think he had several hundred, 393 interactions. Right, but you didn't raise the scope of the injunction before the district court, did you? You didn't say to the district court what you're saying to us now. There are other uses we want to. We could use them. That was not raised at the oral argument in front of the district. Basically, reading between the lines of your argument, what you want is to be able to continue your allegedly infringing use on the website, right? No, well. I said allegedly. I mean, that's what you want during the pendency of this case. That's why you want your domain name back, right? We want our domain name back because we can't use it in any way whatsoever. What I would say is that the reason why they were getting blocked in the past is we registered in Class 42 that services. The USPTO observed, and it would be legitimate to observe, that services and goods are closely aligned. So we believe we already had occupied the field. I see I'm out of time. And unless there's a specific question, thank you very much.  Thank you, both counsel, and for your briefing and argument. Very interesting case. Very well argued, and we really do appreciate that. This matter is submitted, and we're done for the week. Thank you so much, everybody. All right.
judges: THOMAS, OWENS, COLLINS